# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LANDMARK HOSPITAL OF SALT LAKE CITY,**<br><br>Plaintiff,<br><br>v.<br><br>**ALEX M. AZAR II,** *Secretary, United States Department of Health and Human Services*,<br><br>Defendant. | Civil Case No. 1:19-01227 (TNM) |
| **LANDMARK HOSPITAL OF SAVANNAH,**<br><br>Plaintiff,<br><br>v.<br><br>**ALEX M. AZAR II,** *Secretary, United States Department of Health and Human Services*,<br><br>Defendant. | Civil Case No. 1:19-01228 (TNM) |

## MEMORANDUM OPINION

The Landmark Hospitals of Salt Lake City and Savannah recently found themselves on the wrong end of Medicare reimbursement penalties caused by a typographical error and—depending on one's view—either Landmark's carelessness or a temporary glitch in the online reporting system. The penalties set Landmark back to the tune of $400,000. Landmark administratively appealed them twice. But apparently perplexed by its own regulations, the Department of Health and Human Services ("HHS") misapplied its rules in denying the appeals, overlooking one of Landmark's main arguments in the process.

Landmark has moved for summary judgment, arguing that the Secretary of HHS violated the Administrative Procedure Act by adopting an erroneous decision. The Court agrees. Unable to say with any confidence whether the Secretary would have reached a different result under the correct rules, the Court will grant partial summary judgment for Landmark, deny the Secretary's cross-motions, and remand both cases to the Secretary for further proceedings consistent with this opinion.

## I.

This case is awash in complex and changing (sometimes contradictory) agency procedures. Save for one key fact, HHS could be forgiven for losing sight of some of those changes. But alas, HHS not only officiates Medicare and Medicaid, it writes the rules of the game as it goes along. This case is a study in what can happen when an agency proliferates rules at such a clip that even it cannot keep up. At every level of review, HHS misapplied the procedures it enacted. But the rulebook must be strictly enforced, especially against the rule maker.

The Centers for Medicare & Medicaid Services ("CMS") administers the day-to-day operation of Medicare on behalf of the Secretary. *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 901 n.1 (D.C. Cir. 2010). One of the integral functions of that administration is the system of agreements between CMS and the providers who care for the insured beneficiaries. *See* 42 U.S.C. § 1395cc. Among that network are many long-term care hospitals ("LTCHs") that have contracted with the Secretary to receive reimbursement for care. *See id.*; 42 C.F.R. § 412.23(e). Under their agreements, LTCHs have to submit regular quality data and measures according to the Secretary's guidelines and timelines. 42 U.S.C. § 1395ww(m)(5)(C). And if a hospital fails

the reporting standards, it faces a two-percent reduction in Medicare reimbursement for the year. *Id*. § 1395ww(m)(5)(A)(i); 42 C.F.R. § 412.523(c)(4).

That is exactly what happened to Landmark here. In Landmark Salt Lake City's case, a CMS contractor notified the hospital one week before the February 2016 reporting deadline that CMS had not received the hospital's data. Salt Lake City ("SLC") A.R. 369, ECF No. 29-1. Surprised, the hospital's Director of Quality Management ("DQM") logged into the reporting website, only to find error messages for two reports she thought she had submitted. *Id*. at 195, 369. The DQM claims she re-entered the data, saved and submitted it, then "logged on to the website several times prior to the [] deadline to ensure no further error messages had been generated and she confirmed there were none." *Id*. at 369. But CMS never received the submissions. *Id*. at 119–120. Several months later, CMS notified the hospital it would impose a two-percent penalty for FY 2017, which Landmark estimates to be about $129,000. *Id*.; SLC Compl. ¶ 4, ECF No. 1.

In Savannah, a different reporting error led to an even costlier penalty. There, Savannah's DQM timely entered reporting data in May 2016 through the same national website. Savannah Pl.'s Mot. for Summ. J. 6, ECF No. 19. After verifying the submission with a CMS contractor, she checked the website several times before the deadline. *Id*. And like her counterpart in Salt Lake City, she saw no cause for concern. *Id*. But it turned out the Savannah DQM had mistakenly transposed two digits of the CMS Certification Number. *Id*. at 8. As a result, the reporting data never made it to CMS. Savannah A.R. 9–10, ECF No. 31-2. Two months after the reporting deadline closed, CMS informed the hospital of the two-percent penalty. *Id*. at 269–70. And again, the notice caught Landmark flatfooted. *Id*. at 10. Landmark estimates the two-percent penalty at $275,000. Savannah Compl. ¶ 4, ECF No. 1.

3

After receiving the penalty letters, Landmark asked CMS to reconsider. SLC A.R. at 368–70; Savannah A.R. at 379–81. Landmark argued that the Salt Lake City reporting error was caused by "a technical error with the [reporting website], rather than a failure to submit." SLC A.R. at 369. And Landmark claimed that Savannah's transposed digits were "not a failure to submit, [but] rather a clerical issue." Savannah A.R. at 380. CMS responded with nearly identical form letters informing both hospitals that it had "reviewed the reconsideration request" but was "upholding the decision to reduce the annual payment" for FY 2017. SLC A.R. at 357–58; Savannah A.R. at 271–72.

Failing there, Landmark turned to the Provider Reimbursement Review Board, a "quasi-judicial" group that "conducts hearings and renders decisions on appeals from Medicare providers[.]" 46 Fed. Reg. 56,911, 56,912 (Nov. 19, 1981). The Board conducted a joint evidentiary hearing for both hospitals' appeals and ultimately upheld CMS's decision to impose the two-percent payment reductions. SLC A.R. at 6–13, 170–244; Savannah A.R. at 6–14, 167–239. Because the Secretary declined to act on the Board's decisions, they are final. 42 U.S.C. § 1395oo(f)(1). Landmark now seeks judicial review under the Administrative Procedure Act ("APA").[1] *See id.*; SLC Compl. ¶¶ 27, 38; Savannah Compl. ¶¶ 27, 43.

## II.

The Court reviews the Board's final decisions under the APA's standards of review. 42 U.S.C. § 1395oo(f)(1); *Nursing Ctr. of Buckingham & Hampden, Inc. v. Shalala*, 990 F.2d 645,

---

[1] Landmark also argues that the penalties should be reversed on "equitable grounds." *See* SLC Pl.'s Mot. for Summ. J. 37, ECF No. 19; Savannah Pl.'s Mot. at 43. Although the Court does not reach this argument, it appears dubious. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute *and final agency action for which there is no other adequate remedy in a court* are subject to judicial review.") (emphasis added); *Cohen v. United States*, 650 F.3d 717, 731 (D.C. Cir. 2011) (noting party agreement that "if an adequate remedy at law exists, equitable relief is not available under the APA"); *id.* at 738 n.2 (Kavanaugh, J. dissenting) ("Those [APA] requirements are related to a bedrock principle of the American legal system: Equitable relief is not available when there is an adequate remedy at law." (citations omitted)).

650 (D.C. Cir. 1993). Normally, a court will grant summary judgment when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). But Rule 56's standards do not apply to a court's review of a final agency action under the APA. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006). In these cases, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id*. at 90 (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

Under the APA, the Court will set aside the Board's decision only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Grant Med. Ctr. v. Hargan*, 875 F.3d 701, 705 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)). Though a court's review of agency action under the arbitrary and capricious standard is "narrow," it must determine whether the agency "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). If the agency's reasoning is deficient, the "court should not attempt itself to make up for such deficiencies" or "supply a reasoned basis for the agency's action that the agency itself has not given." *Id*. (citation omitted). But it may still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id*. (cleaned up).

### III.

These cases bring a feeling of déjà vu for the Court. Just weeks ago, the Court remanded another CMS case to the Secretary for applying an outdated version of its own rule. *See PAM Squared at Texarkana v. Azar*, --- F. Supp. 3d ----, No. 1:18-CV-02542 (TNM), 2020 WL

364782 (D.D.C. Jan. 22, 2020). As here, the Board in *PAM Squared* denied a hospital's appeal of a two-percent payment reduction. *Id.* at *2. Throughout its analysis, the apparently confused Board repeatedly cited rules for reconsidering FY 2015 payments, ignoring the fact that a more recent regulation governed the hospital's FY 2017 appeal. *Id.* at *4. Only once the Court raised the issue did the Secretary finally recognize the problem. *Id.* at *4–5. Finding this pervasive error to be arbitrary and capricious, the Court remanded the issue to the Secretary to apply the proper rules. *Id.* at *5–7. And the Court will do so again here. While this case may have different particulars, the Board's decision illuminates a strikingly similar error.

A.

To see why, consider Landmark's arguments before the Board. Landmark cited the preamble to CMS's final rule for reconsidering payment determinations, which says that a hospital must submit documentation showing either "full compliance" or "extenuating circumstances that affected noncompliance[.]" SLC A.R. at 176; Savannah A.R. at 173; *see* 79 Fed. Reg. 49,854, 50,317 (Aug. 22, 2014). Landmark argued for reversal on both grounds. SLC A.R. at 176; Savannah A.R. at 173. Landmark maintained that both hospitals fully complied with their reporting requirements, and that even if they did not, extenuating circumstances excused the noncompliance. SLC A.R. at 176; Savannah A.R. at 173.

Landmark also supported its argument with citations to the regulation where CMS codified that final rule. SLC A.R. at 324–25; Savannah A.R. at 333–34; *see* 42 C.F.R. § 412.560. Citing subsection (d) of that regulation, entitled "Reconsiderations of noncompliance decisions," Landmark highlighted that it had supported its position with "'documentation that demonstrates compliance . . . with the quality reporting requirements.'" SLC A.R. at 325 (quoting 42 C.F.R. § 412.560(d)(2)(vii)); Savannah A.R. at 333–34.

6

Now compare the Board's rationale for denying Landmark's appeals. The Board first rejected Landmark's claims that the hospitals' submissions were timely. SLC A.R. at 10–11; Savannah A.R. at 10–12. Those findings do not affect the Court's decision today, and the Court does not address them here. To be sure, one may question the Board's hyper-technical finding that Landmark Salt Lake City presented "no *documentary* evidence to show when the missing reporting plans . . . were input[ted] into [the reporting website]." SLC A.R. at 11 (emphasis added). After all, the Board never mentioned a Landmark officer's *testimonial* evidence that she and the Salt Lake City DQM personally verified all reporting data in the online system before the deadline. SLC A.R. at 195. But perhaps, despite that testimony, the Board's finding was correct. It is also possible that in Landmark Savannah's case, the hospital was compliant despite its transposition error. In any case, the Court's decision hinges instead on the Board's faulty analysis of Landmark's extenuation argument. *See* SLC A.R. at 11–12, 176; Savannah A.R. at 12–13, 173.

There, the Board concluded that its "controlling regulations" precluded "an exception or extension" because Landmark "failed to demonstrate that its [submissions failure] was an *extraordinary* circumstance beyond its control." SLC A.R. at 11–12 & n.35 (citing 42 C.F.R. § 412.560(c) and 78 Fed. Reg. 50,495, 50,886 (Aug. 19, 2013)) (emphasis added); Savannah A.R. at 12–13 & n.40. A careful eye might see the Board's errors. Landmark's extenuation argument quoted Volume 79 of the Federal Register, yet the Board cited the previous year's volume. More important, the Board misapplied the Regulation when it cited 42 C.F.R. § 412.560(c) instead of subsection (d).

7

**B.**

Recall that subsection (d) is entitled "Reconsideration of noncompliance decisions." 42 C.F.R. § 412.560(d). That is the provision that the Board should have applied for Landmark's appeal. *See* SLC A.R. at 357 ("Non-Compliance Decision Upheld"); Savannah A.R. at 271. Instead, the Board looked to subsection (c), entitled "Exception and extension request requirements." 42 C.F.R. § 412.560(c). But aside from that fact that Landmark never invoked subsection (c) during its appeals, the two provisions also have different requirements. *See* SLC A.R. at 176, 324–25; Savannah A.R. at 173, 333–34. Subsection (c) is a waiver provision, and subsection (d) applies to reconsiderations after CMS has already determined noncompliance. *See* 42 C.F.R. §§ 412.560(c), (d). And while subsection (c) requires hospitals to submit "[e]vidence of the impact of the extraordinary circumstance, including, but not limited to, photographs, newspaper articles, and other media[,]" 42 C.F.R. § 412.560(c)(3)(vi), subsection (d) simply requires "documentation that demonstrates compliance" with the reporting requirements, 42 C.F.R. § 412.560(d)(2)(vii).

This is where the Board "got lost in its own labyrinth of Medicare regulations." *PAM Squared*, 2020 WL 364782, at *1. Subsection (c) also allows CMS to grant "an exception or extension . . . for one or more quarters, in the event of certain extraordinary circumstances beyond the control of the long-term care hospital[.]" 42 C.F.R. § 412.560(c). The Board evidently considered that provision to be the "key phrase" in the Regulation, then denied Landmark's appeal for failing to show circumstances beyond its control. SLC A.R. at 11–12; Savannah A.R. at 12–13. Trouble is, that "key phrase" is absent from subsection (d). *See* 42 C.F.R. § 412.560(d)(2). And that alone is enough to reject the Board's decision and remand this case to the Secretary. "One thing no agency can do is apply the wrong law to citizens who come

before it." *Caring Hearts Pers. Home Servs. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016) (Gorsuch, J.) (cleaned up).

But there is another reason the Board's analysis was flawed. Not only did the Board apply the wrong regulatory subsection, but just like in *PAM Squared*, the Board also relied on an obsolete rule. *See PAM Squared*, 2020 WL 364782, at *5–6. Consider this attempt to grapple with Landmark's "extenuating circumstances" argument:

> The Board recognizes that, in the preamble to the LTCH final rule published on August 19, 2013, CMS stated that, for reconsiderations relevant to FY 2015 LTCH payments, "[w]e may reverse our initial finding of non-compliance if: (1) The LTCH provides proof of compliance with all requirements during the reporting period; or (2) the LTCH provides adequate proof of a valid or justifiable excuse for non-compliance if the LTCH was not able to comply with requirements during the reporting period." 78 Fed. Reg. 50,495, 50,886 (Aug. 19, 2013). However, it is unclear whether CMS alone has the authority to consider a "justifiable excuse" as this discussion was not incorporated into the governing regulation at 42 C.F.R. §412.523(c)(4). The Board need not resolve this issue as it is clear that the Provider does not have a "justifiable excuse."

Savannah A.R. at 13 n.40; *see also* SLC A.R. at 12 n.35. Note the entirely new list of references. Once again, the Board looked to CMS regulations only to find a slightly different standard than the one Landmark invoked. Here, the Board reviewed for neither "extraordinary" nor "extenuating circumstance," reviewing a third standard, "justifiable excuse," from yet another incorrect source. *See* 78 Fed. Reg. at 50,886.

So the Board's efforts to harmonize CMS's own rulemaking and regulatory framework never got off the ground. That was a shame, because the same inconsistencies plague the CMS regulations that the Board should have applied. When CMS codified its rule from Volume 79 of the Federal Register at 42 C.F.R. § 412.560, the "extenuating circumstances" language in the preamble did not carry over. It is unclear why. *See* 80 Fed. Reg. 49,325, 49,755 (Aug. 17, 2015) ("We did not propose to change the process or requirements for requesting reconsideration, and

9

we refer readers to [79 Fed. Reg. at 50,317–50,318]."). The Board's review of outdated authority deprived Landmark and the Court of meaningful consideration of that issue.

But is this all much ado about nothing? The "extraordinary circumstances" that the Board rejected sound an awful lot like the "extenuating circumstances" standard that Landmark argued for. *Compare* 42 C.F.R. § 412.560(c) *with* 79 Fed. Reg. at 50,317. Perhaps this is all too formalistic. Then consider setting aside the linguistic ring and ask whether "extraordinary" and "extenuating" are really synonymous. The former is a "highly unusual set of facts that are not commonly associated with a particular thing or event," while the latter is a "fact or situation that does not justify or excuse a wrongful act or offense but that reduces the degree of culpability." Black's Law Dictionary (11th ed. 2019). "Extraordinary" implies rarity. In contrast, "extenuating" carries a more specialized meaning; an acknowledgment of mistake and a bid for reprieve from the consequence. And extenuation explicitly "does not justify or excuse." *Id*. So the Board's conclusions that Landmark's circumstances were neither extraordinary nor justifiable were not satisfactory proxies for the correct extenuation standard. Like homonyms, "extenuating" and "extraordinary" sound alike but mean different things. If CMS intends to use both words in adjacent subsections, the Board will need to learn to tell them apart.

And far from tamping down the taint of the Board's error, glossing over these regulatory changes will only stoke the fear that the laws have become "so voluminous that they cannot be read, or so incoherent that they cannot be understood; if they be repealed or revised before they are promulgated, or undergo such incessant changes that no man, who knows what the law is to-day, can guess what it will be to-morrow." The Federalist No. 62, at 381 (James Madison) (Rossiter ed., 1961). This is not kosher, it's Kafkaesque.

10

Landmark raised these objections to the Board and the Secretary, to no avail. Before the Board, Landmark even highlighted that "[n]either the [CMS] Reconsideration nor the [opposition's] Final Position Paper discusses whether [Landmark] has demonstrated extenuating circumstances that affected non-compliance." SLC A.R. at 100; *see also* Savannah A.R. at 96. And again here, Landmark alerted the Secretary that the Board "applied the wrong regulation to evaluate Plaintiff's evidence under this standard." SLC Pl.'s Reply 11, ECF No. 24 (emphasis omitted); Savannah Pl.'s Reply 8, ECF No. 24. These pleas have only spurred the Secretary to double down on the Board's mistake. *See* SLC Def.'s Reply 15–16, ECF No. 28; Savannah Def.'s Reply 11–12, ECF No. 28. And even if the Secretary now acknowledged Landmark's arguments, the Court may not accept "*post hoc* rationalizations for agency actions." *State Farm*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id*. On that basis, this agency action fails.

The Board's misapplication of CMS rules was prototypically arbitrary and capricious. At minimum, the Board and the Secretary had to consider the "relevant factors" governing Landmark's appeals. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). But the Board "entirely failed to consider an important aspect of the problem[.]" *State Farm*, 463 U.S. at 43. And even after Landmark identified the error, the Secretary declined to step in to correct the Board's "clear error of judgment." *Citizens to Pres. Overton Park*, 401 U.S. at 416.

Given that clear error, the appropriate remedy is a remand to the Secretary so he can oversee Landmark's appeal under the correct rubric. *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal

11

error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").

Landmark would prefer that the Court vacate the Board's decision and "direct CMS to apply the full annual payment update to the [hospitals'] FY 2017 Medicare reimbursements." SLC Pl.'s Mot. at 2; Savannah Pl.'s Mot. at 2. But a remand is appropriate here so the Secretary can direct a new review. Considering the Board's errors, the Court cannot say that "the outcome of a new administrative proceeding is preordained." *Am. Train Dispatchers Ass'n v. ICC*, 26 F.3d 1157, 1163 (D.C. Cir. 1994).

Landmark might fare better under the correct standards. It might not. Perhaps the different circumstances in Savannah and Salt Lake City will lead to different outcomes. "It is not the Court's role to guide the agency through its own regulations. Nor should it hypothesize how the correct regulation might alter the Board's analysis." *PAM Squared*, 2020 WL 364782, at *6. All the Court can say with certainty is that "the Board's reasoning came about by reviewing the CMS reconsideration through the tainted lens of the wrong regulation." *Id*. And that, at the very least, cannot stand.

## IV.

Because the Board relied on the incorrect regulations to affirm CMS's reconsideration decision, Landmark is entitled to summary judgment. The Court will therefore grant Landmark's motions in part, deny the Secretary's motions, and remand this matter to the agency for further proceedings. Appropriate orders will issue.

Dated: March 2, 2020                               TREVOR N. McFADDEN, U.S.D.J.